Marc P. Berger
Lara Shalov Mehraban
Sandeep M. Satwalekar
Charu A. Chandrasekhar
Tracy E. Sivitz
Kimberly A. Yuhas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0029 (Sivitz)
SivitzT@sec.gov (Sivitz)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES SECURITES AND EXCHANGE COMMISSION | : : : |
| Plaintiff, | : : |
| v. | : ECF CASE : : COMPLAINT AND JURY : DEMAND |
| HECTOR A. MAY, VANIA MAY BELL, | : : : |
| Defendants, and | : : : |
| SONIA MAY, | : : |
| Relief Defendant. | : : |

---

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against Defendants Hector A. May ("May") and Vania May Bell ("Bell") and Relief Defendant Sonia May, alleges as follows:

### SUMMARY OF ALLEGATIONS

1. May, an investment adviser, and Bell, his daughter and the controller of his firm, misappropriated at least $7.9 million from at least 15 investment advisory clients by perpetrating

a Ponzi scheme. May's victims included people close to May who knew and trusted him through familial ties, friendship, or local community connections.

2. May, with Bell's assistance, offered to buy bonds for his clients, solicited their funds for the investments, and then diverted the money for his own use. Over the life of the scheme, instead of buying bonds, May used his clients' money to pay for salaries for himself and Bell, business and personal credit card bills, a limousine driver, country club dues, home remodeling, travel, personal loans to friends, political contributions, a vacation home, and furs and jewelry for his wife.

3. In an effort to conceal and further perpetuate the scheme, May and Bell created and sent the clients fabricated account statements reporting fictitious purchases of bonds. Over time, as the fake bond purchases multiplied, these account statements grossly inflated the victims' holdings, deceiving them further. For example, an account statement for one client couple, dated December 19, 2017, listed a total portfolio value of over $8.6 million even though the couple actually had less than $51,000 in assets.

4. May and Bell also used clients' money to make Ponzi-like payments to other clients who sought to withdraw funds. These payments also falsely reassured the withdrawing clients that May had in fact made profitable investments for them and thereby furthered the scheme to defraud.

## VIOLATIONS

5. By engaging in the conduct alleged herein, May violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R

§ 240.10b-5] thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

6. By engaging in the conduct alleged herein, Bell violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and 77q(a)(3)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and 240.10b-5(c)] thereunder, and aided and abetted May's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [17 C.F.R. § 240.10b-5] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act, [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

7. Unless Defendants are permanently restrained and enjoined, they will engage in future violations of these provisions.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The Commission brings this action pursuant to authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]. The Commission seeks to restrain and permanently enjoin the Defendants from engaging in the acts, practices, and courses of business alleged herein. In addition, the Commission seeks a final judgment (i) ordering the Defendants to disgorge their ill-gotten gains with prejudgment interest thereon; (ii) ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and (iii) ordering Relief Defendant to disgorge her ill-gotten gains with prejudgment interest.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because many of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred in this district. Hector May's investment advisory firm is located in this district. May is domiciled and conducts business in this district. Many of May's and Bell's clients are also domiciled and conduct business in this district.

11. In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

12. Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial losses and significant risk of substantial losses to other persons, and substantial pecuniary gain to Defendants.

## DEFENDANTS

13. **May**, age 77, is a resident of Orangeburg, New York. May has worked in the financial services industry for approximately 35 years, including as an Investment Adviser Representative ("IAR") of a broker dealer ("Broker-Dealer-A") from 1994 until March 9, 2018 when he was fired. May was also the President and Chief Compliance Officer of Executive

Compensation Planners, Inc. ("ECP"), an investment advisory firm registered in New York, from 1982 through May 1, 2018 when the registration was terminated.

14.     **Bell**, age 53, is a resident of Montvale, New Jersey. She is May's daughter and worked at ECP from 1993 until March 9, 2018. Bell handled ECP's financial and administrative duties; from 2015 onward her official title was "Senior Compliance Administrator/Controller."

### RELIEF DEFENDANT

15.     **Sonia May**, age 79, is a resident of Orangeburg, New York and May's wife.

### RELATED ENTITY

16.     **ECP** was a New City, New York-based investment adviser founded by May and registered in New York from 1983 until May 1, 2018. According to ECP's 2017-filed Form ADV, ECP had two owners: May who owned 95% or more of the company and May's wife, Sonia May, who owned less than 5%.

### FACTS

**A.     The Fraudulent Scheme**

17.     Over the course of a Ponzi scheme, May and Bell misappropriated at least $7.9 million from at least 15 advisory clients. Of that sum, May and Bell misappropriated at least $1.6 million in the last five years of the scheme, from approximately April 2013 to April 2018 (the "Relevant Period").[1]

18.     May's defrauded clients included participants in a pension fund; close family friends; the children and grandchildren of long-time clients; and local community members.

19.     The misappropriation scheme followed a similar pattern across all of the client victims. As an IAR of Broker-Dealer A, May typically used Broker-Dealer A's brokerage

services and clearing firm to conduct trades for his Broker-Dealer A clients. For the scheme, however, May offered to buy bonds for his victims away from the Broker-Dealer A brokerage platform, claiming that he could obtain a better price and avoid certain fees. May knew, when he made these misrepresentations to clients, that he would not be purchasing bonds but would misappropriate the funds for his own use.

20. In order to obtain the funds for the purported bond purchases, May told clients to transfer funds from their Broker-Dealer A accounts to their personal bank accounts. May then instructed his clients to approve the transfer in the event they were contacted by Broker-Dealer A for confirmation. Bell created wire transfer requests to facilitate the client transfers, and followed up with Broker-Dealer A to make sure the funds were sent. Once the funds were transferred to the personal bank accounts of May's clients, May and Bell instructed clients to then transfer the funds for the requisite bond price, and to make the transfer payable, for the client's benefit, to the "ECP Custodial Account." In some instances, clients would simply transfer funds directly from their personal bank account rather than initiating the transfer from Broker-Dealer A. May informed his clients that if he were unavailable they should address any questions about their fund transfers to Bell.

21. Once the client funds were deposited into the ECP Custodial Account, May and Bell arranged for the transfer of most of those funds to the ECP Operating Account. From the ECP Operating Account, the funds were then misappropriated and, unbeknownst to the victims, used to pay for May's business expenses (including Bell's salary), living expenses, and luxury items.

---

[1] Any time-related defenses for the conduct alleged in this Complaint against May have been tolled for the period from April 9, 2018 through November 30, 2018, inclusive.

22. Over the past five years, May also remitted at least $150,428.04 to his wife, Sonia May, from the ECP Operating Account. Sonia May conducted no work for ECP during this period.

23. May also used funds deposited into the ECP Custodial Account to make payments from defrauded clients' funds to other clients who were seeking to withdraw principal or redeem alleged returns on non-existent investments.

24. May and Bell then fabricated periodic account statements for ECP clients that purported to contain all of the assets they held at Broker-Dealer A, including the fake bonds, their returns, and valuations. Bell, using templates she had created to resemble the statements produced by Broker-Dealer A, typed up May's fabricated handwritten statements into official-looking statements that appeared to reflect genuine bond holdings.

25. May and Bell regularly updated the false account statements. May made handwritten edits with false information and gave them to Bell, who created new versions on her computer that were then sent to clients.

26. In addition, May and Bell kept a partial accounting of the misappropriated funds on ECP balance sheets, which were labeled "Long Term Liabilities." Bell input the information to create these balance sheets on a QuickBooks bookkeeping template. On each individual balance sheet under "Long Term Liabilities," each individual client from whom funds were stolen was listed by name, along with the corresponding amount stolen from them to date, which was labeled as a "Loan Payable."

27. Of course, none of the defrauded clients had authorized any "loans" to ECP. Rather, they believed, as represented by May and Bell, that their money had been invested in bonds.

28. Through his intentional misstatements and deceptive conduct, May violated the fiduciary duty that every investment adviser owes to his clients: to put clients first, to deal with the utmost honesty, to disclose all conflicts of interest, and to use reasonable care in providing investment advice.

29. Bell partnered with May in carrying out the Ponzi scheme and misappropriating client funds. As ECP's controller, Bell had full access to and managed the ECP Custodial and Operating account records, including overseeing (i) the deposit of funds into the Custodial Account "for the benefit of" May's clients; (ii) the transfer of funds to the Operating Account for May's use or to pay out purported investment returns to other clients; and (iii) inputting ECP's banking transactions into the firm's bookkeeping program, QuickBooks. In fact, during a recorded conversation in February 2016, Bell touted her deep understanding of the firm's operations, stating that "there is nothing in this office that I don't know, haven't touched, haven't seen, haven't done. . . . I am his daughter, I am his confidant."

**B.     Investors A, B and C**

*Investors A and B*

30. Investor A, a husband, and Investor B, his wife, became May's clients in 1999 as a result of a personal friendship and investment advisory relationship between May and Investor A's father.

31. May misappropriated at least $5.5 million from Investors A and B from July 2001 through March 2018, including $781,875 in the Relevant Period. As of March 12, 2018, Investors A and B had $54,427.40 in their Broker-Dealer A accounts.

32. May and Bell concealed their fraud from Investors A and B by falsely stating that May was investing their money in bonds. For example, on July 15, 2014, after Investors A and

B had already "invested" with May for over a decade, May wrote an email to Investor A stating, "I am renewing a $75,000 bond today for one year, I can get a higher rate (from 2.25 to 2.75%) if you are inclined to deposit an additional $25,000." This email also included the wiring instructions as "ECP Custodial account FBO [Investors A and B]," and indicated the transaction and ECP Custodial Account number. Investor A promptly emailed his banker, copying May, "Please take $25,000 from my joint account and wire per instructions from [May]." The same day that the the money arrived, May wired $20,000 to the ECP Operating Account, and used it to write $6,000 in checks to his wife and Bell and a $10,000 check to a flooring company. He also wired out $6,500 for ECP's health insurance premium and $487.00 for his car payment.

33. Similarly, on May 18, 2015, May wrote an email to Investor B, informing her that two $25,000 bonds that she and her husband purportedly held had matured on May 15 and May 18, 2015. He said, "I will consolidate for a higher rate @2.65% tax free one bond @50,000 for two years." May asked Investor B to instruct the couple's banker to wire the funds to the ECP Custodial Account for their benefit, and on May 20, 2015, the $50,000 wire arrived. May did not invest the $50,000, but misappropriated it for his own business and personal expenses.

34. May also used funds from Investors A and B to pay other clients seeking to withdraw their principal or recoup what they believed to be returns on bond investments. For example, on April 17, 2015, Investors A and B transferred $60,000 to ECP for a purported bond purchase. May used $43,000 of this amount for redemptions to four other clients and kept $17,000 for himself. On March 7, 2017, Investors A and B provided May with $80,000 for a purported bond purchase. May wired $30,000 to another client that same day, and kept $50,000 for himself.

9

35. May and Bell regularly created fabricated account statements containing false portfolio values that they directly provided to Investors A and B. For example, May created (and Bell finalized) a handwritten draft account statement, dated December 19, 2017, for provision to Investors A and B, which showed a total account value of $8,662,956.25. In truth, the value of their holdings at that time was $50,265.39.

*Investor C*

36. Investor C is a small New York-based company that maintained two different accounts managed by May at Broker-Dealer A: (1) the Defined Benefit Pension Plan ("DBPP") and (2) the Profit Sharing Plan ("PSP").

37. From 2001 to 2018, May misappropriated at least $1.4 million from Investor C, and at least $465,000 of that sum was misappropriated during the Relevant Period.

38. For example, on November 22, 2016, May emailed Investor C about a bond purchase and requested a $50,000 wire to ECP's Custodial Account "FBO [Investor C's DBPP]." On November 25, 2016, the ECP Custodial Account received the $50,000 in wired funds from Victim C. Immediately prior to this $50,000 credit, the ECP Custodial Account reflected a balance of $263.63. That same day, May issued a Custodial Account check in the amount of $24,569 for a "loan" to an acquaintance at a 6% rate of interest. The remaining $25,000 was transferred to ECP's Operating Account in various increments over the next several days for May's own use.

39. Typically, after May had arranged for purported bond purchases for Investor C's accounts, Bell followed up with the paperwork, sending Investor C Broker-Dealer A's wire request forms for signature by the pension fund trustees. For example, on December 15, 2016, Bell emailed two wire request forms, one for $25,000 and one for $30,000, with the word

"BOND" typed into the "Purpose for the Wire Transfer" boxes. She requested that the original signatures be returned by December 19, 2016, as "[t]hese items need to be processed before our office closes for the Christmas and New Year's Holiday." On December 23, 2016, $55,000 was wired into the ECP Custodial Account FBO [Investor C's] Defined Benefit Plan. That same day, the $55,000 was withdrawn and used to satisfy another client's withdrawal request.

40. May and Bell prepared fabricated account statements for distribution to Investor C. For example, phony statements prepared by May and Bell for the DBPP and PSP accounts for year-end 2016 reflected total account balances of $1,431,789.37 and $786,249.04, respectively. In truth, the *combined* value of those accounts in December 2016 was just over $8,000.

## FIRST CLAIM FOR RELIEF
### Violation of Securities Act Section 17(a)
### (May)

41. Paragraphs 1 through 40 are realleged and incorporated by reference herein.

42. May, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:

    a. knowingly or recklessly employed devices, schemes, or artifices to defraud;

    b. knowingly, recklessly or negligently obtained money or property by means of untrue statements of material fact or omission to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and

      c. knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

43. By engaging in the conduct described above, May violated, and unless restrained and enjoined will in the future violate, Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5
### (May)

44. Paragraphs 1 through 40 are realleged and incorporated by reference herein.

45. May, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, knowingly or recklessly:

      a. employed devices, schemes, or artifices to defraud;

      b. made untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

      c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

46. By engaging in the conduct described above, May violated, and unless restrained and enjoined will in the future violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## THIRD CLAIM FOR RELIEF
### Violation of Advisers Act Sections 206(1) and 206(2)
### (May)

47.     Paragraphs 1 through 40 are realleged and incorporated by reference herein.

48.     May, by engaging in the conduct described above, while acting as an investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

    a. employed devices, schemes, or artifices to defraud clients; and

    b. engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients.

49.     By engaging in the conduct described above, May, directly or indirectly, singly or in concert, violated, and unless restrained and enjoined will in the future violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FOURTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(1) and (3)
### (Bell)

50.     Paragraphs 1 through 40 are realleged and incorporated by reference herein.

51.     Bell, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:

    a. knowingly or recklessly employed devices, schemes, or artifices to defraud; and

    b. knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

52. By engaging in the conduct described above, Bell violated, and unless restrained and enjoined will in the future violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

### FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c)
### (Bell)

53. Paragraphs 1 through 40 are realleged and incorporated by reference herein.

54. Bell, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, knowingly or recklessly:

    a. employed devices, schemes, or artifices to defraud; and

    b. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

55. By engaging in the conduct described above, Bell violated, and unless restrained and enjoined will in the future violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Bell)

56. Paragraphs 1 through 40 are realleged and incorporated by reference herein.

57. Bell, by engaging in the conduct described above, singly or in concert, directly or indirectly, knowingly or recklessly provided substantial assistance to May, who by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, in the offer or sale of securities, knowingly or recklessly employed devices, schemes,

or artifices to defraud; knowingly, recklessly or negligently obtained money or property by means of untrue statements of material fact or omission to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

58. By engaging in the conduct described above, Bell aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, violations of Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Rule 10(b) and Rule 10b-5**
**(Bell)**

59. Paragraphs 1 through 40 are realleged and incorporated by reference herein.

60. Bell, by engaging in the conduct described above, singly or in concert, directly or indirectly, knowingly or recklessly provided substantial assistance to May, who in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, knowingly or recklessly employed devices, schemes, or artifices to defraud; knowingly or recklessly made untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and knowingly or recklessly engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

61. By engaging in the conduct described above, Bell aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## EIGHTH CLAIM FOR RELIEF

**Aiding and Abetting May's Violations of Advisers Act Sections 206(1) and (2)**
**(Bell)**

62. Paragraphs 1 through 40 are realleged and incorporated by reference herein.

63. Bell, by engaging in the conduct described above, singly or in concert, directly or indirectly, knowingly or recklessly provided substantial assistance to May, who directly or indirectly, while acting as an investment adviser, by use of the means of and instrumentalities of interstate commerce or the mails, employed devices, schemes, or artifices to defraud clients; and engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients.

64. By engaging in the conduct described above, Bell aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## NINTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Sonia May)**

65. The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 40 as if fully set forth herein.

66. Sonia May has obtained funds as part, and in furtherance, of the securities violations alleged above, and under circumstances in which it is not just, equitable or conscionable for Sonia May to retain the funds. As a consequence, Sonia May has been unjustly enriched.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

A. Permanently enjoin May from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

B. Permanently enjoin Bell from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a), Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and permanently enjoin Bell from, directly or indirectly, aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] by other persons;

C. Order each of the Defendants to disgorge the ill-gotten gains obtained as a result of the conduct alleged in this Complaint with prejudgment interest;

D. Order each of the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

E. Order Relief Defendant Sonia May to disgorge ill-gotten gains obtained as a result of the conduct alleged in this Complaint with prejudgment interest; and

F. Grant such further relief as the Court may deem just and appropriate.

Dated: New York, New York
       December _13_, 2018

                Respectfully submitted,

                _/s/ M. P. Berger_
                Marc P. Berger
                Lara Shalov Mehraban
                Sandeep M. Satwalekar
                Charu A. Chandrasekhar
                Tracy E. Sivitz
                Kimberly A. Yuhas
                Attorneys for Plaintiff
                U.S. Securities & Exchange Commission
                New York Regional Office
                200 Vesey Street, Suite 400
                New York, NY 10281
                (212) 336-0029 (Sivitz)
                Email: SivitzT@sec.gov